## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| RICHARD RAUGUST, | CV 20–09–H–DWM |
| Plaintiff, | |
| vs. | OPINION |
| | and ORDER |
| WAYNE ABBEY, | |
| Defendant. | |

This case stems from the wrongful conviction of Plaintiff Richard Raugust for the murder of Joe Tash. Raugust brings a 42 U.S.C. § 1983 claim against Defendant Wayne Abbey, a Sanders County deputy sheriff, premised on Abbey's alleged failure to disclose evidence materially favorable to Raugust in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The crux of Raugust's claim is that Abbey failed to disclose something he observed on the night of the murder that would have substantiated Raugust's alibi defense at trial.

Although there are six motions currently pending in the case, this order addresses only the motions for summary judgment. Abbey seeks summary judgment on the grounds that Raugust's § 1983 claim is time-barred and that Abbey's nondisclosure does not rise to the level of deliberate indifference. (Doc. 52.) He further seeks summary judgment on the basis of qualified immunity.

1

(Doc. 85.)  On the other hand, Raugust seeks partial summary judgment on the first two elements of his § 1983 claim on the basis of collateral estoppel.  (Doc. 67.) For the reasons provided below, Abbey's motions for summary judgment are denied, and Raugust's motion for partial summary judgment is granted.

**BACKGROUND**

The following facts are undisputed unless otherwise noted, (*see* Docs. 59, 83, 100), and viewed in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam).

## I.  The 1997 Murder and Investigation

During the late evening hours of July 23, 1997, and into the early morning hours of July 24, 1997, Rory Ross, Joe Tash, and Raugust spent the evening drinking at the Naughty Pine Saloon in Trout Creek, Montana.  (Doc. 59 at ¶ 1.) While conducting a routine bar check, Abbey encountered Ross, Tash, and Raugust when they left at approximately 2:15 a.m.  (*Id.* ¶¶ 2, 4.)  After Ross, Tash, and Raugust departed, Abbey continued to watch them through a window.  (*Id.* ¶ 5.)  Abbey observed their vehicle—a white AMC Eagle belonging to Ross ("Ross's vehicle")—drive from the Saloon parking lot across the street to the Miller's Market parking lot to briefly meet up with Randy Fischer.  (*Id.* ¶¶ 5–6.) After Ross's vehicle left Miller's Market—and central to the dispute underlying Raugust's § 1983 claim—Abbey saw it stop briefly while proceeding down

2

Highway 200, illuminating the brake and dome lights. (*Id.* ¶ 7.) Abbey observed that Ross's vehicle was stopped long enough for someone to exit the vehicle, but he did not witness anyone do so. (*Id.* ¶¶ 7, 9.)

Several hours later, Ross called Sanders County 911 services from a rural home to report that Tash had been shot in the head at a nearby campsite in the woods. (*Id.* ¶¶ 10, 16.) Abbey was dispatched to the campsite crime scene. (*Id.* ¶¶ 12–14, 17.) On his way, Abbey stopped and spoke to Ross, who was hysterical and stated that "Rich shot Joe." (Doc. 54-1 at 36.) When Abbey arrived at the crime scene, he noticed the property was on fire in two different locations. (Doc. 59 at ¶ 18.) Abbey secured the scene, verified Tash was dead, called dispatch for assistance, and attempted to extinguish the fire. (*Id.* ¶ 19.) Mark Denke, the coroner, and Perry Mock, a Sanders County detective, arrived to assist Abbey. (*Id.* ¶ 22.) Abbey turned the scene over to Denke and Mock and returned to the Saloon to look for "Rich" Raugust. (*Id.* ¶ 23.) There, another Trout Creek resident told Abbey that Raugust was working at Brown's trailer park. (*Id.* ¶¶ 24–25.) Abbey, accompanied by the sheriff, coroner, and undersheriff, proceeded to Brown's trailer park, where they arrested Raugust. (*Id.* ¶¶ 26–30.)

Abbey provided a written report detailing his investigation and a supplemental report upon request from the prosecutor's office after Raugust's arrest. (*Id.* ¶ 34; Doc. 100 at ¶ 7.) While the supplemental report established that

Abbey had seen Ross, Tash, and Raugust leave together in Ross's vehicle, neither report documented his observations regarding the brief stop of Ross's vehicle on Highway 200. (Doc. 59 at ¶ 35; Doc. 100 at ¶ 8.) The parties dispute the significance Abbey attributed to his observation and the reasons for its nondisclosure. (Doc. 59 at ¶¶ 9, 35–36.)

## II.    Raugust's Trial and Conviction

Raugust's trial took place in March 1998. (*Id.* ¶ 31.) Abbey was called as a prosecution witness, testifying first on Monday morning and leaving immediately after his testimony. (*Id.* ¶¶ 32, 33.) His testimony did not mention seeing Ross's vehicle stop on Highway 200. (*Id.* ¶ 36.) At trial, Raugust asserted an alibi defense that he had exited Ross's vehicle at approximately the location Abbey observed it stop before the vehicle proceeded to the scene of the crime. (*Id.* ¶ 38.) Raugust's alibi was that he went to his friend Rick Scarborough's house to rest before work the next morning. (*Id.* ¶ 39.) The parties dispute whether Abbey had knowledge of Raugust's alibi defense. (*Id.* ¶ 37; *see* Doc. 100 at ¶ 4.) And indeed, several witnesses' testimony contradicted Raugust's alibi defense at trial. Scarborough testified that Raugust did not stay at his residence, (Doc. 59 at ¶ 47), and the Albanos, Trout Creek residents who lived near Tash, testified that they heard Raugust's voice at the campsite on the night Tash was killed, (*id.* ¶¶ 42, 44).

4

Ross also testified he had not stopped his vehicle on Highway 200 to let Raugust out, and that he had personally witnessed Raugust shoot Tash. (*Id.* ¶ 46.)

The jury deliberated for ten hours before convicting Raugust of deliberate homicide, attempted arson, and attempted tampering with or fabricating physical evidence. (*Id.* ¶ 48.) On June 9, 1998, Raugust was sentenced to life in prison for homicide, twenty years for attempted arson, and ten years for attempted evidence tampering, plus an additional ten years for use of a dangerous weapon. (*Id.* ¶ 49.)

## III.   Postconviction Proceedings

In 2009, Raugust wrote the Montana Innocence Project requesting help to overturn his conviction. (*Id.* ¶ 50.) The Montana Innocence Project's investigator interviewed Abbey in August 2013, during which Abbey relayed his observations regarding the brief stop of Ross's vehicle and the illumination of the brake and dome lights. (*Id.* ¶ 51.) In light of Abbey's observations, Raugust filed a petition for postconviction relief in Montana's Twentieth Judicial District Court, alleging that Abbey's previous nondisclosure constituted a *Brady* violation. (*Id.* ¶¶ 52–53.) On November 16, 2015, Judge Wheelis determined that Abbey's nondisclosure was a *Brady* violation, and accordingly, issued Findings of Fact, Conclusions of Law, and an Order and Notice of Continuing Jurisdiction that reversed Raugust's conviction and ordered a new trial. (*Id.* ¶ 54; Doc. 59-1.) The State subsequently

moved to dismiss the charges against Raugust with prejudice, which Judge

Wheelis granted in September 2016.  (Doc. 59 at ¶ 55; Doc. 59-2.)

## IV.    The Present Action

Pursuant to Mont. Code Ann. § 2–9–301, Raugust sent a demand letter on

May 13, 2019, to the Montana Risk Management & Tort Defense Division seeking

compensation for his wrongful conviction.  (Doc. 59 at ¶ 56; Doc. 59-3.)  Among

the defendants listed in the demand letter were Sanders County, Perry Mock, and

Gene Arnold.  (Doc. 59-3.)  The demand letter did not personally name Abbey,

however, and the parties dispute whether it incorporated Abbey.  (Doc. 59 at ¶ 57.)

Raugust sent another letter on August 26, 2019, requesting Sanders County notify

him if the county commissioners rejected his demand pursuant to Mont. Code Ann.

§ 27–2–201(3).  (*Id.*; Doc. 59-4.)

On December 19, 2019, Raugust filed a Complaint in Montana's First

Judicial District Court for claims arising from his wrongful conviction.  (Doc. 59 at

¶ 58.)  He named the State of Montana, Sanders County, Deputy Abbey, Sheriff

Arnold, and the Estate of Perry Mock.  (*Id.*)  He named the individual defendants

in both their official and individual capacities.  (*Id.* ¶ 59.)

On February 4, 2020, the defendants removed the case to the United States

District Court for the District of Montana, and it was assigned to Judge Charles C.

Lovell.  (*Id.* ¶ 60.)  Defendants Sanders County, Abbey, Arnold, and Estate of

Mock moved to dismiss the complaint on February 21, 2020, and the State did so on March 25, 2020. (*Id.* ¶ 61.) The State's motion was granted on June 29, 2020, because the applicable statute of limitations barred Raugust's state claims, and on that same basis, Raugust's remaining state law claims against the other defendants were likewise dismissed on July 8, 2020. (*Id.* ¶¶ 63–64; Doc. 27 at 18.) However, because Raugust's federal § 1983 claims had a later accrual date, they survived. (Doc. 59 at ¶¶ 65–66; Doc. 27 at 9–14 ,18.) Notwithstanding, the § 1983 claims against Defendants Sanders County, Deputy Abbey, Sheriff Arnold, and Estate of Mock in their official capacities were dismissed without prejudice for failure to state a plausible claim. (Doc. 59 at ¶ 69; Doc. 27 at 14–18.)

In July 2020, Raugust filed an amended complaint alleging § 1983 claims against Defendants Sanders County and Wayne Abbey in his individual capacity, after which both parties again moved to dismiss. (Doc. 59 at ¶¶ 71–74; *see* Doc. 28.) The County's motion was granted, rendering Raugust's § 1983 claim against Abbey the only surviving claim. (Doc. 59 at ¶¶ 70, 74–76; Doc. 39 at 6–7.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it impacts the outcome of the case in accordance with governing substantive law. *Anderson v. Liberty*

7

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  All reasonable inferences must be viewed in the light most favorable to the non-moving party.  *Tatum v. Moody*, 768 F.3d 806, 814 (9th Cir. 2014).  On cross-motions for summary judgment, it is the court's "independent duty to review each cross-motion and its supporting evidence . . . to determine whether the evidence demonstrates a genuine issue of material fact."  *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Each motion is therefore evaluated separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences."  *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (quotation marks omitted).

ANALYSIS

As a threshold issue, the parties dispute whether Raugust's claim was timely plead.  The parties further dispute whether certain elements of Raugust's *Brady* claim were established by Judge Wheelis's 2015 Order and whether Abbey exhibited deliberate indifference upon failing to disclose his observations of Ross's vehicle.  Finally, Abbey argues that he is entitled to qualified immunity.  At this stage of the proceeding, all three inquiries are resolved in favor of Raugust.

**I.      Statute of Limitations**

8

Abbey first argues that Raugust's claim is time-barred. While federal law governs the accrual of Raugust's §1983 claim, *see Heck v. Humphrey*, 512 U.S. 477 (1994), state law governs the applicable statute of limitations, *see Owens v. Okure*, 488 U.S. 235, 239, 249–50 (1989). Judge Lovell determined in his July 8, 2020 Opinion & Order that Raugust's § 1983 claim accrued on September 9, 2016 when the State dismissed all pending charges against Raugust with prejudice. (Doc. 27 at 13.) The applicable statute of limitations is three years, regardless of whether the general personal injury statute, Mont. Code Ann. § 27–2–204, or the specific statute raised by the parties, Mont. Code Ann. § 27–2–209(1), governs. It is therefore undisputed that absent tolling, the statute of limitations lapsed on September 9, 2019. Because Raugust's complaint was filed on December 19, 2019, (Doc. 59 at ¶ 58), the applicability of the tolling provision is dispositive of the timeliness of Raugust's claim.

There is no dispute of material fact pertinent to this issue; instead, the parties dispute the applicability of the tolling effect of § 27–2–209(3) to Abbey in his *individual* capacity—a question of law. Raugust insists his claim is timely for three reasons: (1) consideration of the statute of limitations and tolling issues is precluded by the law of the case doctrine; (2) Raugust's limitations period for his § 1983 claim against Abbey individually was tolled by § 27–2–209(3) and the demand letter dated May 13, 2019; and (3) in the alternative, equitable tolling

9

preserved the timeliness of Raugust's claim.  (Doc. 58 at 15–28.)  Because Raugust is correct, his claim proceeds on the merits.

Pursuant to the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (quotation marks omitted).  The purpose of the doctrine is to "promote judicial finality," and as such, it forecloses reconsideration of issues that were "actually considered and decided by the first court." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1995).  The doctrine "encompasses a court's explicit decisions as well as those issues decided by necessary implications." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989) (quotation marks omitted).  The doctrine "is not a limitation on a tribunal's power, but rather a guide to discretion." *Alexander*, 106 F.3d at 876.  But a court may exercise its discretion to depart from the law of the case only if: (1) the first decision was clearly erroneous; (2) an intervening change in the law has occurred; (3) the evidence on remand is substantially different; (4) other changed circumstances exist; or (5) a manifest injustice would otherwise result. *Id.*

Here, Raugust argues the law of the case doctrine precludes consideration of the statute of limitations and tolling issues because they were previously resolved by Judge Lovell and there is no reason to depart from that prior ruling.  In

10

response, Abbey insists that Judge Lovell's decision addressed claim accrual, not tolling. Abbey therefore argues there is no prior binding ruling. Raugust has the better argument.

Judge Lovell resolved this issue in his July 8, 2020 Opinion & Order, albeit implicitly. Pursuant to the tolling effect of § 27–2–209(3), Judge Lovell determined that Raugust's federal § 1983 claim survived against the "County Defendants"—at the time, Sanders County; Wayne Abbey, individually and in his official capacity; Gene Arnold, individually and in his official capacity; and Estate of Perry Mock, individually and in his official capacity. (Doc. 27 at 14.) The tolling effect of § 27–2–209(3) preserved the timeliness of Raugust's federal § 1983 claim because Raugust's demand letter was presented to Sanders County within three years of September 9, 2016. (*Id.* at 13–14.) Sanders County and the individual defendants in their *official* capacities were dismissed by virtue of the requisite federal § 1983 standard, not issues with tolling. (*Id.* at 15–16.)

Judge Lovell did not distinguish between the individual defendants in their official versus individual capacity for purposes of tolling. Instead, Judge Lovell determined that § 27–2–209(3) and the effect of Raugust's demand letters presented to Sanders County within three years of September 9, 2016 preserved the timeliness of Raugust's claims against *all* defendants, irrespective of individual or official capacity designations. (*See* Doc. 27 at 13–14.) As a result, Abbey

11

remained a defendant in his individual capacity. (*Id.* at 18.)  Therefore, Judge

Lovell's Opinion & Order determined by "necessary implication" that § 27–2–

209(3) and the demand letter which named Sanders County tolled the statute of

limitations for Raugust's § 1983 claim against Abbey in his individual capacity.

Consistently, it is not determinative that Abbey did not explicitly raise the tolling

issue in his motion to dismiss.

Nor are there conditions present that would permit departure from the

implicit disposition of Judge Lovell's Opinion & Order.  First, there have been no

pertinent changes in the law or other changed circumstances.  Second, no manifest

injustice would result upon permitting Raugust's § 1983 claim against Abbey

individually to proceed.  Nor was Judge Lovell's decision clearly erroneous.

Montana law provides a three-year statute of limitations for "liability incurred by

the doing of an act in [a] person's official capacity," § 27–2–209(1), and tolling of

that limitations period "depending upon the timing of the filing of the notice of the

claim with the county, and the county's response thereto," *Turner v. City of Dillon*,

461 P.3d 122, 125–26 (Mont. 2020) (discussing § 27–2–209(3)).  While Abbey

argues that tolling under § 27–2–209(3) does not apply to him because he is "not a

county," (Doc. 73 at 1), Montana law generally equates government officials with

the corresponding governmental entity because the governmental entity is

responsible for actions employees take within the course and scope of their

employment, *see, e.g.*, §§ 2–9–305(2), 2–9–102. Abbey's focus on the distinction between "individual" and "official" capacity misses the mark, as it is merely a construct of § 1983 that does not impact state tolling statutes. Accordingly, tolling applies under § 27–2–209(3), and was properly triggered by Raugust's demand letter to Sanders County.[1]

## II.   *Brady* Claim

There are three elements to a civil *Brady* claim: "(1) the officer suppressed evidence that was favorable to the accused from the prosecutor and the defense; (2) the suppression harmed the accused; and (3) the officer acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors." *Mellen v. Winn*, 900 F.3d 1085, 1096 (9th Cir. 2018) (quotation marks omitted). The parties seek summary judgment on these discrete elements. Because the first and second elements are established by collateral estoppel, Raugust's motion for partial summary judgment (Doc. 67) is granted. But because genuine issues of material fact remain with respect to the third element, Abbey's motion (Doc. 52) is denied.

### A.   **Suppression and Harm**

---

[1] Even if that were not the case, Raugust would be entitled to equitable tolling based on these same facts. *See Lozeau v. Geico Indem. Co.*, 207 P.3d 316, 323–24 (Mont. 2009).

In his motion for partial summary judgment, Raugust argues that the fact Abbey suppressed evidence and Raugust suffered harm as a result are both established by collateral estoppel in light of Judge Wheelis's 2015 Findings of Fact, Conclusions of Law, and Order and Notice ("2015 Order"). (*See* Doc. 59-1.) In response, Abbey argues collateral estoppel is inapplicable because (1) the parties here are not the same and Abbey was not in privity with the State because he was retired at the time of Raugust's postconviction proceeding; (2) Abbey did not have a full and fair opportunity to litigate the suppression and harm issues and his interests were not adequately represented by the State in the postconviction proceeding; and (3) the issues in this case are not the same as the issues from the postconviction proceeding because a § 1983 claim premised on a *Brady* violation has a higher standard of proof. Abbey also insists that Raugust's offensive collateral estoppel would prevent Abbey from fully defending himself here. Raugust once again has the better argument.

Pursuant to 28 U.S.C. § 1738, state law governs "the preclusive effect of an earlier state judgment" on federal courts. *Intel Corp. v. Advanced Micro Devices, Inc.*, 12 F.3d 908, 914–15 (9th Cir. 1993). In Montana, the elements of collateral estoppel, also known as issue preclusion, are: "(1) the issue has been decided in a prior adjudication and is identical to the one presented; (2) a final judgment on the merits was issued; and (3) the party against whom the plea is asserted was a party

or in privity with a party to the prior adjudication." *Anderson v. State*, 817 P.2d 699, 701 (Mont. 1991). A party is in privity with a party to the prior adjudication if their "interest [was] legally represented at trial" and the prior action was adversarial. *Brault v. Smith*, 679 P.2d 236, 239 (Mont. 1984). Collateral estoppel applies to both findings of fact and conclusions of law "that were actually litigated and necessarily decided in a prior proceeding." *Hawkins v. Risley*, 984 F.2d 321, 325 (9th Cir. 1993). Collateral estoppel is appropriate provided "the prior litigation was fair and adequate." *Id.* (citation omitted).

Offensive collateral estoppel, where a plaintiff seeks to "estop a defendant from relitigating the issues which the defendant previously litigated and lost," does not advance judicial economy the same way defensive collateral estoppel does. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979). As a result, trial courts have broad discretion to determine whether offensive collateral estoppel applies. *Id.* at 331. The core concern is the fairness to the defendant based on the following considerations: the defendant's incentive to "defend [the first action] vigorously, particularly if future suits are not foreseeable"; whether the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; and whether "the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Id.* at 330–31. Moreover, "the presence or

15

absence of a jury as factfinder is basically neutral, quite unlike, for example, the

necessity of defending the first lawsuit in an inconvenient forum." *Id.* at 332 n.19.

Here, the 2015 Order was a final judgment on the merits of identical issues

to the first two elements of Raugust's § 1983 claim: (1) Abbey suppressed

evidence that was materially favorable to Raugust from the prosecutor and the

defense and (2) that suppression harmed Raugust. (*See* Doc. 59-1 at 9–14.)

Additionally, Abbey was in privity with the State in Raugust's postconviction

proceeding; the gravamen of Raugust's claim was Abbey's withheld observation as

a Sanders County deputy sheriff acting on behalf of the State. (*See* Doc. 59-1.)

Further, the postconviction proceeding was an adversarial proceeding where the

State adequately represented Abbey's interests—i.e., resisting Raugust's

postconviction petition on the basis of Abbey's conduct. (*See id.*)

Importantly, the fairness policy underpinning offensive collateral estoppel

does not weigh against its application here. First, the State had an interest in

defending Abbey's conduct in Raugust's postconviction proceeding to protect its

conviction. Additionally, Abbey testified in that proceeding and had a strong

interest in defending his conduct, as evidenced by his continued denial of

knowledge of Raugust's alibi defense until August 2013, (*id.* at 5), because future

suits were foreseeable as § 1983 claims often flow from similar proceedings. The

2015 Order is also not inconsistent with any previous judgments in favor of Abbey.

16

(*Id.* at 1–2.)  Finally, the fact that Abbey could have a jury resolve the issues is at most "neutral" and not determinative here.  Thus, the first two elements of Raugust's *Brady* claim are established by collateral estoppel.

However, application of collateral estoppel poses an interesting issue here as it relates to the third element of deliberate indifference.  The 2015 Order determined that Abbey's testimony overall was credible, and Abbey testified that "[u]ntil August of 2013, [he] never knew that [Raugust] had raised an alibi defense at trial." (Doc. 59-1 at 5.)  This is noteworthy because, as explained below, Abbey's knowledge—or lack thereof—of Raugust's alibi defense is critical to at least one of Raugust's deliberate indifference theories.  *See Mellen*, 900 F.3d at 1101–03.  Nevertheless, Abbey's assertion that he did not have knowledge of Raugust's alibi until August 2013 is not established by virtue of collateral estoppel because it was not "actually litigated and necessarily decided" or otherwise pertinent to the ultimate conclusion that Abbey violated his *Brady* duty in the criminal postconviction context.  The standard for a *Brady* violation in the postconviction context is (1) the evidence at issue must be favorable to the accused; (2) the evidence must have been suppressed by the state, *either willfully or inadvertently*; and (3) the failure to disclose the evidence must have prejudiced the accused.  (*See* Doc. 59-1 at 10.).  Notably, to satisfy the burden, mere inadvertence will suffice.  Thus, whether Abbey possessed knowledge of

17

Raugust's alibi defense was immaterial to the finding of inadvertence, and as a result, was not "actually litigated and necessarily decided" by the 2015 Order.

Consequently, while the first two elements of Raugust's § 1983 *Brady* claim—Abbey's suppression of favorable evidence that harmed Raugust—were established by the 2015 Order, deliberate indifference was not likewise established. The merits of the deliberate indifference dispute are therefore addressed below.

**B.   Deliberate Indifference**

The Ninth Circuit determined the "deliberate indifference to or reckless disregard for" standard encapsulates the requisite level of culpability to subject an individual to § 1983 liability for a *Brady* violation because "the decision whether to disclose or withhold exculpatory evidence is a situation where actual deliberation is practical."[2] *Tennison v. City & Cnty. of S.F.*, 570 F.3d 1078, 1089 (9th Cir. 2009) (quotation marks omitted).  Deliberate indifference is a "conscious or reckless disregard of the consequence of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or without knowledge that harm will result." *Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (quoting *Gantt v. City of L.A.*, 717 F.3d 702, 708 (9th Cir. 2013)).  Whether a defendant acted with

---

[2] In light of this established standard, Abbey's arguments regarding municipal liability under *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), and proof of "practical deliberation" under *Tennison*, are not relevant.

deliberate indifference is a question of fact, *Mellen*, 900 F.3d at 1101, and

ultimately, there remain genuine disputes of material fact pertinent to this inquiry;

therefore, Abbey's motion for summary judgment on this ground is denied.

### 1.    Case Law

Three cases provide useful guideposts for how courts have interpreted

deliberate indifference in the context of a civil *Brady* claim.  First, under *Mellen*,

both an actor's knowledge regarding the significance of withheld *Brady*

exculpatory evidence and an actor's experience are relevant to the overall

deliberate indifference culpability determination.  900 F.3d at 1101–03.  *Mellen*

concerned a § 1983 claim against a detective, Detective Winn, for her failure to

disclose *Brady/Giglio*[3] evidence that would have impeached the credibility of the

prosecution's key trial witness, June Patti.  *Id.* at 1101.  The Ninth Circuit

highlighted Detective Winn's particularized knowledge—resulting from her

attendance at Mellen's trial and pre-trial involvement—that Patti was the only

witness to incriminate Mellen, and, further, that her credibility was a prominent

issue due to her inconsistent trial and pretrial testimony.  *Id.* at 1101–02.  Although

Detective Winn disputed whether she was actually informed of Patti's lack of

credibility before trial, the Ninth Circuit indicated that such a factual dispute is

reserved for a jury.  *Id.* at 1102.  Assuming Detective Winn had this information,

---

[3] *See Giglio v. United States*, 405 U.S. 150 (1972).

coupled with her extensive experience and training, the Ninth Circuit concluded that it was for the jury to ascertain whether a "reasonable officer in Detective Winn's position acted with deliberate indifference to Mellen's due process rights, taking into account the seriousness of the charges levied against Mellen, what was known to Detective Winn at the time, and evidence about what a reasonable police officer would do in the same position." *Id.* at 1103.

Second, motive underlying nondisclosure can evidence deliberate indifference. *Tennison*, 570 F.3d at 1089–90. In *Tennison*, two police inspectors, Hendrix and Sanders, investigated Tennison for murder. *Id.* at 1081. During their investigation, conflicting accounts emerged concerning who committed the murder; two different suspects were identified, one of whom was Tennison. *Id.* at 1083. A month after a jury found Tennison guilty, the other identified suspect was arrested for unrelated charges by two other officers, who taped an interview where that individual confessed to committing the murder. *Id.* at 1084. Although they provided this tape to Hendrix and Sanders, neither provided the tape to the district attorney or defense counsel. *Id.* Hendrix later testified in a deposition that he was angry that the interview was conducted without him and Sanders, and that he believed the confession was insincere. *Id.* at 1089–90. Based upon this conduct, the Ninth Circuit concluded that the inspectors' conduct displayed a "reckless disregard for [Tennison's] rights" beyond mere negligence. *Id.*

20

Finally, an officer is not liable for a *Brady* violation if the causal chain is attenuated or the claim is premised on the officer's negligent acts or omissions. *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007). In *Porter*, the alleged *Brady* violation arose from investigating detective Fairbanks's failure to turn over two reports that contained exculpatory evidence that would have substantiated the defense theory of the case. *Id.* at 1308–1311. With respect to the first report, it was brought to a pre-trial deposition of one of the responding officers and subsequently found in the Pasco County Sheriff's Office in connection with Porter's federal habeas petition. *Id.* at 1301, 1309–10. Therefore, the Eleventh Circuit determined Fairbanks could not be liable under § 1983 because the causal chain to Fairbanks was broken as it had clearly been turned over at some point to the prosecutor, but not the defense. *Id.* at 1309. Although there were not the same causal issues with the second report, the Eleventh Circuit observed that Fairbanks's failure to turn over the exculpatory report could have been due to Fairbanks misplacing it. *Id.* at 1311. However, even assuming Fairbanks had misplaced it, there was "no evidence of ill-will or motive on the part of Fairbanks," and accordingly, he was not liable under § 1983. *Id.*

### 2. Analysis

Here, Abbey insists that because his conduct was consistent with that in *Porter*, he was not deliberately indifferent as a matter of law. At the heart of

Abbey's argument is his lack of knowledge concerning Raugust's alibi defense at trial. Abbey claims his conduct mirrors the investigator's conduct in *Porter* because, although Abbey did not disclose his observation to the prosecutor, there is no indication that such failed disclosure was accompanied by ill-will or motive due to his purported lack of knowledge. Moreover, Abbey maintains that he did not even satisfy a negligent level of culpability because his lack of knowledge negates the foreseeability requirement. Contrary to Abbey's characterization, this case trends closer to *Mellen* than *Porter*.

Raugust counters that Abbey's own words exemplify his deliberate indifference and ignorant mental state when he described his efforts to "push" the Tash investigation from his mind. (Doc. 58 at 28–30.) Accordingly, Raugust distinguishes *Porter* because unlike *Porter*, there were no causation issues and Abbey deliberately chose not to disclose his observation in full. Further, Raugust proffers that regardless of Abbey's knowledge, he was still deliberately indifferent to Raugust's rights because Raugust failed to disclose his full observations of the night of the murder even after being asked to prepare a supplemental report. Finally, Raugust disputes Abbey's knowledge of Raugust's alibi; Raugust contends that Abbey must have known of Raugust's alibi because he was the most experienced and trained officer in Sanders County at that time, the crime was the most significant crime in a small county, and a small law enforcement agency,

22

where both Abbey and his wife worked, was responsible for the investigation.  (*See* Doc. 59 at ¶ 37.)

As a preliminary matter, neither parties' arguments regarding Abbey's purported compliance with the applicable standard of care is dispositive of the deliberate indifference inquiry.  As discussed above, mere negligence does not implicate the due process concerns at issue.  *See Porter*, 483 F.3d at 1307.

While the parties dispute the core factual determination of deliberate indifference, there appear to be additional factual disputes embedded in that overarching inquiry.  Specifically, the parties disagree about Abbey's knowledge, or lack thereof, of Raugust's alibi defense.  (Doc. 59 at ¶ 37.)  Additionally, the parties dispute whether Abbey attached any significance to his observation of Ross's vehicle, irrespective of Abbey's knowledge of Raugust's alibi.  (*Id.* ¶ 9.)  These disputes preclude summary judgment because Abbey's knowledge of Raugust's alibi and the significance he attached to the observation of Ross's vehicle are independent material facts which bear on the outcome of whether he was deliberately indifferent, or simply negligent, upon withholding disclosure of his observation under governing precedent.  Importantly, these disputes are genuine because Raugust has proffered evidence which would permit a reasonable jury to return a verdict for Raugust—specifically, it could permit a finding that

23

Abbey possessed knowledge of the alibi or attached enough significance to the observation to manifest the requisite culpability of deliberate indifference.

Consistently, construing the disputed facts in the light most favorable to Raugust, it cannot be concluded as a matter of law that Abbey's withheld observation did not exhibit deliberate indifference. To be sure, unlike *Mellen*, where Detective Winn was present for the duration of the trial and pretrial proceedings where the key witness's credibility was a core issue, Abbey was not present at Raugust's trial where Raugust presented his alibi defense. (Doc. 59 at ¶ 33.) However, construing Abbey's disputed knowledge of Raugust's alibi in the light most favorable to Raugust, the circumstantial evidence proffered by Raugust suggests that Abbey could have or should have known of Raugust's alibi: Abbey was the first officer on the scene and actually spoke to Ross and other witnesses that day; Abbey was present for Raugust's arrest; Abbey omitted critical details from his first investigative report, requiring the prosecutor to request a supplemental report; this was a significant crime committed in a small community; Abbey was one of six officers at the time; Abbey had received training on *Brady*; Abbey's wife also worked at the Sheriff's Department. (*See id.* ¶ 37.) In that case, it would be deliberately indifferent to Raugust's constitutional due process rights and the truth to withhold an observation of Ross's vehicle that corroborated

Raugust's alibi because *Mellen* deems such knowledge a critical inquiry concerning deliberate indifference.

Moreover, like *Mellen*, where Detective Winn's training and experience furnished her with the capacity to appreciate the value of the impeachment evidence, Abbey had training and experience which would have provided him with the ability to understand the importance of disclosing a complete account of his observations. (Doc. 69-4 at 30:5–32:7.) Consequently, consistent with the outcome in *Mellen*, it is for the province of the jury to ascertain whether a reasonable officer in Abbey's position acted with deliberate indifference to Raugust's rights or the truth considering the seriousness of the homicide charge against Raugust, what Abbey knew at the time, and evidence concerning what a reasonable police officer would have done in the same situation.

Moreover, while Abbey's conduct does not fit within the egregious contours of *Tennison*, he is not completely absolved of any potential for culpability beyond that of mere negligence as was the case in *Porter*. Unlike *Tennison*, where the inspectors intentionally withheld a taped confession out of anger, there is no direct evidence at this point that Abbey had an intentional motive in withholding his observation. While Raugust highlights Abbey's ignorance, as evidenced by his desire to "push" the investigation out of his mind, Abbey was not concealing any specific knowledge that an individual had exited Ross's vehicle—he did not have

25

any such knowledge. (Doc. 59 at ¶ 9.) His only observation was that Ross's vehicle stopped long enough for a person to exit, not that an individual departed from the vehicle at that time. (*Id.* ¶¶ 7–9.) But, unlike *Porter*, where there were issues with the chain of custody such that a *Brady* violation could not be inferred with respect to the officer, Abbey's observation was never memorialized in any form such that the burden of disclosure could be shifted to the prosecutor. (*Id.* ¶¶ 35–36.) Accordingly, there were no issues with the chain of custody which would have extinguished Abbey's *Brady* obligation and transferred the responsibility to someone else. Further distinguishable from *Porter*, where the second report may have been misplaced as a result of negligence, Raugust has put forth evidence which, construed in the light most favorable to Raugust, indicates that Abbey may have known about Raugust's alibi defense or at least had the training and experience to understand that he needed to document his observation in full due to the gravity of the underlying murder investigation. (*Id.* ¶¶ 35–37.) Finally, the observation at issue was Abbey's own observation as a first-hand witness, not the failure to document what another person saw or did.

In sum, there remain genuine issues of material facts that prevent summary judgment on the question of deliberate indifference.

## III.   Qualified Immunity

26

Abbey also seeks summary judgment on Raugust's § 1983 claim on the
ground that Abbey is entitled to qualified immunity. (Doc. 85.) Whether an
individual is shielded by qualified immunity is a two-step inquiry: first, a court
must determine whether the plaintiff has shown a violation of a constitutional right,
and second, a court must determine whether the specific right was "clearly
established" at the time of the defendant's alleged misconduct. *Pearson v.
Callahan*, 555 U.S. 223, 232 (2009). The two-part test is flexible and does not
need to be analyzed in succession. *Id.* at 242. Qualified immunity may therefore
be granted if the contours of the constitutional right were not "clearly established"
at the time of the violation, irrespective of whether the plaintiff established a
constitutional violation. *Id.* at 232.

Here, Abbey first attempts to make an end run around Judge Wheelis's
conclusion that Abbey's conduct comprised a *Brady* violation by maintaining that
Abbey was not aware of his observation's materiality and potential exculpatory
value until 2013. But, as discussed above, a constitutional violation has been
sufficiently alleged, as determined by Judge Wheelis's 2015 Order and the genuine
dispute of material fact concerning deliberate indifference. (Doc. 59 at ¶ 37.)
Therefore, immunity at this stage turns on the "clearly established" prong.

By 1984, it was clearly established "that police officers were bound by
*Brady*'s disclosure requirements." *Carrillo v. City of L.A.*, 798 F.3d 1210, 1223

27

(9th Cir. 2015); *see also Atkins v. Cnty. of Riverside*, 151 F. App'x 501, 507 (9th Cir. 2005) (explaining that "as for the *Brady* claim, a police officer in 1988 should have been aware of his obligation to not withhold exculpatory evidence").  But, as argued by Abbey, the relevant inquiry is "whether every reasonable police officer would have understood the specific evidence allegedly withheld was clearly subject to *Brady*'s disclosure requirements."  *Carrillo*, 798 F.3d at 1223.  Thus, the dispositive question here is whether evidence corroborating the defendant's alibi fell within *Brady*'s ambit.  It did.  As discussed in detail in Judge Wheelis's 2015 Order, Abbey's observation of Ross's vehicle would not only have corroborated Raugust's version of events, but it also impeached the testimony of the only purported eyewitness to the murder insofar as Ross testified that he did not stop the car.  (*See* Doc. 59-1 at 11.)  Abbey's observation would have necessarily bolstered Raugust's alibi defense and "put the whole case in such a different light as to undermine the confidence in the verdict."  *Kyles v. Whitney*, 514 U.S. 419, 435 (1995); *see also Wearry v. Cain*, 577 U.S. 385, 393 (2016) (describing the importance of "relatively minor" alibi evidence in a case with a very similar trial posture).  It was therefore classic *Brady* evidence.

As made clear at the April 13 hearing, Abbey's primary argument is that *Brady* only requires an officer to disclose evidence that has "apparent exculpatory value."  Abbey insists that *Brady* does not impose "an undifferentiated and

28

absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (Doc. 86 at 11 (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).) He is wrong. Contrary to Abbey's characterization, the "apparent exculpatory value" language is limited to the context of law enforcement's failure to preserve evidence, *see Youngblood*, 488 U.S. at 57; *California v. Trombetta*, 467 U.S. 479, 488–89 (1984), not the failure to disclose evidence. In the disclosure context, the Ninth Circuit has specifically rejected the argument that an officer or prosecutor can or should act as the arbiter of relevant evidence, as to do so "would be to appoint the fox as henhouse guard." *Carrillo*, 798 F.3d at 1226 (quoting *Tennison*, 570 F.3d at 1094). Thus, Abbey's fundamental understanding of his *Brady* obligation—even now—is questionable.

Abbey's argument is also intertwined with the genuine dispute of material facts regarding whether Abbey had knowledge of Raugust's alibi and what level of significance he attached to his observation of Ross's vehicle. (Doc. 59 at ¶¶ 9, 37.) By arguing that no reasonable officer in Abbey's position would have understood that his observation was subject to *Brady* due to his lack of knowledge of Raugust's alibi, he tacitly concedes the materiality of his knowledge to the immunity inquiry. If Abbey knew of Raugust's alibi, he would have understood the importance of his observation of Ross's vehicle. (*Id.* at ¶¶ 9, 37–38.) And, it would have been clear to any reasonable officer in his situation that nondisclosure

29

of this evidence was unlawful.  Thus, due to the genuine dispute of material facts

concerning whether Abbey knew of Raugust's alibi and whether Abbey attached

any significance to his observation, the issue of qualified immunity cannot be

resolved on summary judgment.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Abbey's motions for

summary judgment (Docs. 52, 85) are DENIED and Raugust's motion for partial

summary judgment (Doc. 67) is GRANTED.

DATED this 15 day of April, 2022.

Donald W. Molloy, District Judge
United States District Court