Hillary P. Carls
Sherine D. Blackford
BLACKFORD CARLS P.C.
602 W. Lamme Street
Bozeman, MT 59715
406.577.2145
406.219.0256 (fax)
carls@blackfordcarls.com
sherine@blackfordcarls.com

Melinda Driscoll
Fred Law Firm & Associates, PLLC
214 N. 24th Street, P.O. Box 2157
Billings, MT 59103
406.294.8396
406.294.8398 (fax)
mdriscoll@fredlawfirm.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| Richard Raugust, | CV 20-9-H-DWM |
| Plaintiff, | |
| vs. | **Second Amended Complaint** |
| | **& Jury Trial Demand** |
| Wayne Abbey and Sanders County, | |
| Defendants. | |

Plaintiff Richard Raugust by and through his attorneys, Hillary P. Carls and

Sherine D. Blackford of Blackford Carls P.C. and Melinda Driscoll of Fred Law

Firm & Associates, PLLC, pursuant to the Court's Opinion and Order (April 15,

1

2022) (Doc. 108), files his Second Amended Complaint & Jury Trial Demand and alleges as follows:

## Parties

1.      At all times relevant hereto, Plaintiff Richard Raugust ("Raugust") resided in Montana. He currently resides in Oregon.

2.      Defendant Sanders County ("County") is a political subdivision of the State of Montana.

3.      Defendant Wayne Abbey ("Deputy Abbey") is a former law enforcement officer with the Sanders County Sheriff's Office. At all times relevant hereto, Deputy Abbey resided in Sanders County, Montana.

## Jurisdiction

4.      This action arises under the United States Constitution and 42 U.S.C. § 1983.

5.      The County and Deputy Abbey removed this matter to federal court on February 4, 2020.  Jurisdiction is proper in the United States District Court, for the District of Montana.

## Factual Allegations

6.      In July 1997, Raugust was 31 years old. He had recently moved to Trout Creek, Montana and was living at a campsite with his friend, Joe Tash ("Tash").

7.    On July 24, 1997, Deputy Abbey was on duty in his role as a Deputy Sanders County Sheriff. While making a bar stop at the Naughty Pine Saloon in Sanders County, Deputy Abbey observed Rory Ross ("Ross"), Raugust, and Tash at approximately closing time get into Ross's vehicle, drive to the Miller's Market parking lot, leave the parking lot, and continue down Highway 200.

8.    Deputy Abbey then observed Ross's vehicle stop on Highway 200, and both the red brake lights and white cabin dome light illuminate. Ross's vehicle stopped long enough for someone to exit the vehicle.

9.    Deputy Abbey then observed Randy Fisher's vehicle leave Miller's Market after Ross's vehicle again began traveling down Highway 200.

10.    Raugust explained that on July 24, 1997 after leaving Miller's Market, Ross stopped his vehicle on Highway 200 at Fir Street, where Raugust exited Ross's vehicle and walked to Rick Scarborough's ("Scarborough") house to sleep.

11.    At approximately 5:26 a.m. on July 24, 1997, Ross called 911. Deputy Abbey was the first to respond. Ross reported that Raugust had murdered Tash. Approximately six hours later, Sheriff Gene Arnold, Deputy Perry Mock and Deputy Abbey arrested Raugust for murdering Tash.

12.    Raugust uniformly denied the allegations against him, asserting an alibi defense that he was sleeping at Scarborough's house and not with Ross or Tash at

3

the time of the murder.  Raugust last saw his friend Tash when Raugust was dropped off on Highway 200 at Fir Street.

13.	Deputy Abbey did not share his observations of Ross's vehicle stopping on Highway 200, as outlined in Paragraphs 8 and 9, with Raugust or his attorneys until August of 2013.

14.	Deputy Abbey did not include these observations in his police reports regarding this investigation and crime.

15.	Deputy Abbey did not testify regarding these observations at trial.

16.	At trial, no witness supported Raugust's alibi.

17.	At trial, no witness supported Raugust's explanation that Ross stopped his vehicle on Highway 200 and Raugust then exited the vehicle to sleep at Scarborough's house.

18.	Rather, Ross denied stopping his vehicle after leaving Miller's Market.

19.	Ross testified that he saw Raugust kill Tash.

20.	Scarborough testified that Raugust did not sleep at his house, but walked to Scarborough's house in the early morning of July 24, 1997.

21.	Randy Fisher testified that he did not see Ross's vehicle stop on Highway 200.

22.	Deputy Abbey's observations would have undermined the testimony of Ross, Scarborough, and Fisher at trial, and confirmed Raugust's alibi and defense.

4

23.     The County knew or should have known Deputy Abbey's observations because Deputy Abbey was a Sanders County Sheriff's Deputy and made these observations during the course and scope of his employment.

24.     Deputy Abbey was the first responder to the murder investigation, collected evidence and investigated Tash's death, yet failed to disclose key observations regarding this crime and Raugust's alibi defense, and failed to conduct a thorough investigation.

25.     At the direction of the Sanders County Attorney, on September 4, 1997, Deputy Abbey even supplemented his initial report to include the bar check at the Naughty Pine Saloon and seeing Tash, Ross and Raugust, but omitted his alibi confirming observation where he saw Ross's vehicle stop on Highway 200.

26.     Deputy Abbey's failure to disclose his observations is the consequence of the culture and practices of Sanders County.

27.     At all relevant times, the County, by and through its Sheriff, was the final policy maker authority for the Sanders County Sheriff's Office and law enforcement for the County. (Doc. 27 at 15).

28.     The County is responsible for law enforcement and criminal investigations within Sanders County.

29.     Abbey was a well-trained law enforcement officer. *See* Abbey Depo. at 68-70, 123-124 (Exhibit 1).

30.     Abbey was one of the most experienced and trained law enforcement officers at Sanders County.  *See id*. at 68-70, 123-124.

31.     Abbey's experiences uniquely included receiving an award for his investigative work, locating and connecting multiple clues to solve a homicide in Billings. *See id.* at 79-80.

32.     When Abbey joined Sanders County, his wife Gelinda also joined the Sheriff's office, bringing her significant experience to Sanders County.  *See id.* at 100.

33.     Mrs. Abbey even wrote a report.

34.     Abbey was also charged with writing the policies for Sanders County, bringing his education and experience to direct the work and procedures of Sanders County.  *See id.*  at 115-117.  Abbey had the final decision-making authority for the County because he drafted the policies and procedures for Sanders County.

35.     Despite Abbey's significant training, he was inadequately trained on and cannot correctly explain exculpatory evidence or *Brady*. *See id.* at 166-168.

36.     Gene Arnold was the Sanders County Sheriff during this period. Arnold admittedly had less experience that Abbey. Arnold agreed that Abbey was one of their most experienced deputies. *See* Arnold Depo. at 58 (Exhibit 3).

37.     Arnold was also inadequately trained on exculpatory evidence and *Brady*, and does not know its meaning.  *See id.* at 41-42.

6

38.    In November 1995, Sanders County investigated another homicide—that of Tony Aguilar. *See* Aguilar Article (Exhibit 2); *see also* Abbey Depo. at 105-106 (Exhibit 1).

39.    The investigation of Aguilar's murder also evaded Sanders County, and they were unable to solve the crime.

40.    Less than 2-years later, Sanders County investigated Joe Tash's murder.

41.    On July 24, 1997, Abbey arrested Raugust at approximately noon for murdering his best friend, Joe Tash.

42.    Given Abbey's experience, Arnold explained that Abbey arrested Raugust because Abbey was the "lead investigator." Arnold Depo. at 99 (Exhibit 3).

43.    In approximately 11-hours, Abbey:

    a.   At 2 a.m. had direct contact with Tash, Ross and Raugust and observed this group drive toward the crime scene.

    b.   "[O]bserved Ross's vehicle stop on Highway 200, the dome light illuminate and the brake lights illuminate…."

    c.   3.5 hours later was the first law enforcement officer to have contact with the alleged murder witness, Ross.

    d.   Left Ross at Teepee Mike's instructing him not to leave.

    e.   Was the first law enforcement to arrive at and survey the crime scene.

    f.   Conducted a security screen of the crime scene.

g.  Determined no security threats.

h.  Was the first law enforcement to confirm Tash's death.

i.  Was the first law enforcement to see the fatal injury to Tash.

j.  Identified two fires at the scene.

k.  Touched a sink faucet in the trailer.

l.  Located buckets of water and put out fires.

m.  Contacted dispatch with updates and requests for additional officers.

n.  Supervised the firefighting at the scene.

o.  Discovered a firearm in one of the fires.

p.  Was notified by Ross that he was leaving the scene.

q.  Followed Ross to his mother's house, but did not find him.

r.  Was contacted by the Browns and informed him of Raugust's
    location.

s.  Notified the other officers of Raugust's location.

t.  Was the first law enforcement contact with Raugust.

u.  Arrested Raugust.

v.  Advised Raugust of his Miranda rights.

w.  Directed Raugust's actions, to which Raugust complied.

x.  Transported Raugust to the detention center.

y.  Requested that Raugust submit to a breath test.

*See* Abbey Depo. at 301-307 (Exhibit 1).

44.     Typical of law enforcement agencies, the Sanders County Sheriff's office was organized with a para-military structure, where rank, title and chain of command guide the law enforcement officer's decisions.

45.     Sanders County's customs and practices related to this organizational structure directly impacted its abilities to properly investigate crimes.

46.     After Raugust's arrest, Perry Mock continued the investigation. Like Arnold, Mock had less training and experience than Abbey.

47.     On September 3, 1997, the County Attorney wrote the Montana Attorney General seeking assistance, recognizing the weaknesses in the case against Raugust.  *See* Ltr. Sanders Cty. to MT AG (Exhibit 4).

48.     The next day, September 4, 1997, Abbey supplemented his report to include his bar check at the Naughty Pine Saloon, where he saw Ross, Tash, and Raugust just after 2:00 a.m., but omitted his observation of Ross's vehicle stopping on Highway 200. *See* Abbey Depo. at Exhibit 6 (Exhibit 1).

49.     At the request of Raugust's defense counsel, on August 11, 1997, Mock arranged for Rick Scarborough's house, where Raugust had slept the night of the murder, to be vacuumed. *See id*. at Exhibit 8.

50.     On September 5, 1997 and October 20, 1997, Mock learned during witness interviews of Raugust's alibi. *See* Mock Supplement (Exhibit 5).

51.     On October 14, 1997, Raugust notified the parties of his alibi.  *See* Notice of Alibi (Exhibit 6).

52.     Within a few weeks of Tash's murder, Sanders County was aware of Raugust's alibi, and failed to communicate regarding the progression of the investigation.

53.     The media also regularly reported regarding Raugust's alibi, yet Abbey and Sanders County looked the other way. *See* Missoulian Article (Exhibit 7).

54.     It was well known to all that Raugust would rely on his alibi that he exited Ross's vehicle and stayed at Scarborough's house, as a defense, yet Abbey and Sanders County did nothing with the information they had.

55.     After Abbey's arrest of Raugust and leading up to the trial, Abbey remained involved the investigation.

56.     During this period, Abbey's wife was the jailer where Raugust was being held. *See* Abbey Depo at 52 (Exhibit 1). Abbey also served trial subpoenas on witnesses for their appearance at trial.

57.     Sanders County had a custom and practice of inaction, deprioritizing cases, looking the other way, and failing to communicate, leading to Raugust's wrongful conviction and violation of his constitutional rights.

58.     The County acted with deliberate indifference with its customs and practices.

59.     The County's customs and practices resulted in Deputy Abbey not disclosing his alibi confirming observations and other investigative failures including:

a.      Not interviewing Doug and Lori Cooper, Scarborough's neighbors, when they observed Ross's vehicle drive to the Scarborough residence without headlights between 5:00-5:15 a.m. on July 24, 1997, park in the yard, then head down Larch Street toward Marten Creek Road;

b.      Ignoring other suspects who may have committed the murder, but bolstering Ross to witnesses and protecting Ross in the investigation;

c.      Focusing solely on the original theory of the case;

d.      Failing to gather and secure evidence, including, but not limited to, the fifth-wheel camper, firearms, slash pile remnants, keys to Ross's vehicle, identity of all fingerprints and evidence found in Ross's vehicle, Raugust's clothes, Ross's clothes, the Ross and Scarborough residences, and trace evidence, including gunshot residue on any individual;

e.      Failing to properly secure and search the scene of the murder, including the fifth-wheel camper and camp site;

f.      Ignoring Ross's confession to Fisher that Ross killed Tash;

g.     Ignoring Scarborough's confession to Tom Scarborough that Ross

murdered Tash, that Raugust was asleep at Scarborough's house during the

murder, and that the story about Raugust murdering Tash was a lie; and

h.     Ignoring the confidential informant status of Scarborough.

60.   Sanders County operated its sheriff's office in a para-military organization—

where rank and structure matter.  This structure and rank are important in police

work. *See* Abbey Depo. at 40-42 (Exhibit 1).

61.   This structure impacted the customs of Sanders County. Sanders County

operated under a reverse para-military structure, with the least experienced acting

as Sheriff and the most experienced relegated to a patrol deputy.

62.   Even Mock was detective not because of his qualifications, but rather his

physical and health needs.  *See id*. at 103-104.

63.   In a structure where the least experienced directed the most experienced,

Abbey's knowledge, experience and observations were suppressed.

64.   Under this structure, Abbey did not disclose his observations because he

claimed he was not required to do so unless directly asked by someone he viewed

as his superior.

65.   However, also under this structure, Abbey's supervisor relied on the

experience of Abbey to properly guide investigations—including disclosing

exculpatory information that was only known to Abbey.

66.    Under this structure, Sanders County spiraled in a chicken/egg scenario where both Abbey and the County looked to each other to trigger necessary disclosures, leading the suppression and non-disclosure of material information.

67.    The failure of this structure resulted in Abbey remaining silent and Sanders County not learning the key evidence in investigating the Tash murder.

68.    The failure of this structure is that Sanders County did not learn of and disclose the key evidence in the murder of Tash.

69.    The reverse para-military organization reflected the custom and practice in Sanders County where law enforcement officers did not act, deprioritized cases, looked the other way, and failed to communicate with one another.

70.    Sanders County knew the consequences of its custom because of the failed Aguilar murder investigation; yet it still did not remedy its custom and practice and disregarded the consequences of its actions.

71.    The consequences of this custom and practice continued in the Tash murder investigation and resulted in depriving Raugust of his freedom.

72.    Sanders County disregarded the known consequences of its actions.

73.    Abbey and Sanders County had multiple opportunities and ample deliberation to recognize the importance of Abbey's observation and its impact on Raugust's constitutional rights.

74.    The Tash murder investigation reflected repeated examples of the Sanders County custom and practice of inaction and looking the other way.

75.    This custom was adopted by the entire Sanders County Sheriff's Office, with each Sanders County deputy being trained in the custom of doing nothing and looking the other way.

76.    The custom and training at Sanders County resulted in the pervasive failure to satisfy the basic functions of a law enforcement—to properly investigate, put the clues together, discuss and report observations, solve crimes, and protect our constitutional rights.

77.    This is not the type of policy that would be in writing.  It is a custom that is taught through the leadership, routines, and culture of Sanders County.

78.    The custom was known because it reflected the widespread behavior of the Sander County's law enforcement.

79.    Law enforcement is charged with the responsibility to uphold and protect our Constitution. *See* Abbey Depo. at 185-186 (Exhibit 1).

80.    Law enforcement have an important constitutional role in our communities, that requires a team effort to successfully accomplish.

81.    Sanders County repeatedly failed to benefit from the assets of all members of its team.

82.     Ultimately, Sanders County's chain of command issue created the custom and practice of inaction, deprioritizing cases, looking the other way, and failing to communicate.

83.     This problem was pervasive, and Sanders County was plagued with poor leadership.  This led to poor supervision, training, and investigations.

84.     The repeated examples come to light with failures to properly hire, communicate, lead, train and supervise.  Sanders County was unable to adequately hire, communicate, lead, train and supervise.

85.     This custom and practice prevented Sanders County from solving the Tash murder, and put Raugust in prison for a crime he did not commit.

86.     The County's customs and practices resulted in investigation errors and violated Raugust's Constitutional rights.

87.     On March 26, 1998, a jury convicted Raugust of Deliberate Homicide, Attempted Arson, and Attempted Tampering with or Fabricating Physical Evidence.

88.     On June 9, 1998, Raugust was sentenced to life in prison for Deliberate Homicide, 20 years for Attempted Arson, and 10 years for Attempted Tampering with or Fabricating Physical Evidence, all to run concurrently, with an additional consecutive 10 years for using a dangerous weapon in the offense.

89.     On November 16, 2015, Judge James B. Wheelis reversed Raugust's

conviction and scheduled his case for a new trial.  *See* Findings of Fact,

Conclusions of Law, and Order and Notice of Continuing Jurisdiction (Nov. 16,

2015) (Exhibit 8).

90.     Judge Wheelis comprehensively explained that Abbey's observations were

favorable to Raugust because it corroborated Raugust's testimony and alibi, and

impeached and undermined the State's witnesses. *Id.* at 11.

91.     Judge Wheelis explained that Abbey's observations were material to

Raugust. *Id*. at 11-12.

92.     Judge Wheelis explained that Abbey's observations were suppressed from

Raugust. *Id.* at 13.

93.     Key to the jury's deliberations were Abbey's credibility and testimony, and

whether Ross's vehicle stopped and Raugust exited the vehicle. *See* Juror

Questionnaires (Exhibit 9).

94.     On December 4, 2015, Judge Wheelis ordered Raugust's conditional release

and the State appealed the reversal of the conviction.

95.     Over nine months later, on August 24, 2016, the State moved to dismiss its

appeal and on August 25, 2016, the Montana Supreme Court dismissed the appeal.

96.     On September 6, 2016, the State moved to dismiss the trial setting in the

District Court.  On September 9, 2016, after over 19 years, Raugust's criminal

legal nightmare ended and his case was ordered dismissed.  He was finally no longer under the supervision of the State for a crime he did not commit.

97.    By this point, over 6,987 days had passed since his arrest.

98.    During these 19 years, the majority of which Raugust was incarcerated, he lost his freedom, physical liberty, income, and relationships.  He was forced to suffer extreme fear, emotional trauma, physical injuries, pain and suffering, embarrassment, humiliation, and injury to his reputation, among countless other injuries and damages.

99.    As a result of the above actions and inactions of Deputy Abbey and the County, Raugust suffered serious or severe emotional distress.

100.   The serious or severe emotional distress that Raugust suffered were a reasonably foreseeable consequence of the actions of Deputy Abbey and the County.

101.   The actions of Deputy Abbey and the County resulted in the unlawful incarceration and imprisonment of Raugust.  The actions of Deputy Abbey and the County deprived Raugust of his liberty of movement by restraining him against his will. The restraint was unlawful.

102.   The actions of Deputy Abbey and the County foreseeably created an unreasonable risk of harm to Raugust.

\\\   \\\   \\\

**42 U.S.C. § 1983**

103.   Plaintiff realleges each previous paragraph as though fully set forth herein.

104.   Deputy Abbey is a person subject to the United States Constitution.

105.   The County is a person subject to the United States Constitution.

106.   Raugust is a person protected by the United States Constitution.

107.   Federal law provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.

108.   The United States Constitution, Amendment VI, provides:

In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

109.   The United States Constitution, Amendment XIV, § 1 provides:

All persons born or naturalized in the United States, and subject to the
jurisdiction thereof, are citizens of the United States and of the State
wherein they reside. No State shall make or enforce any law which
shall abridge the privileges or immunities of citizens of the United
States; nor shall any State deprive any person of life, liberty, or
property, without due process of law; nor deny any person within its
jurisdiction the equal protection of the laws.

110.   The actions and inactions of Deputy Abbey and the County violated

Raugust's rights within the United States Constitution, Amendments VI and

XIV.

## § 1983-Deputy Abbey

111.   Plaintiff realleges each previous paragraph as though fully set forth herein.

112.   Raugust's Constitutional rights required Deputy Abbey to disclose evidence

materially favorable to Raugust, including Deputy Abbey's alibi confirming

observations.

113.   Deputy Abbey failed to disclose these observations.

114.   Deputy Abbey violated Raugust's Constitutional rights.

115.   Deputy Abbey proceeded with an unreasonable and deliberate indifference

regarding his failures and the violation of Raugust's Constitutional rights.

116.   Deputy Abbey's violations of Raugust's Constitutional rights shock the

conscience.

117.    Pursuant to 42 U.S.C. § 1983, Deputy Abbey is liable to Raugust because he deprived Raugust of his Constitutional rights.

118.    As a result of Deputy Abbey's violations of Raugust's Constitutional rights, Raugust has been and continues to be injured and damaged in an amount to be determined at trial.

## § 1983-County

119.    Plaintiff realleges each previous paragraph as though fully set forth herein.

120.    "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Department of Social Services*, 436 U.S. 658, 694 (1978).

121.    "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

122.    A sheriff's primary role is to investigate and solve crimes. The County has the duty to ensure that the custom and practice of Sanders County served the role of investigating and solving crimes, as well as protecting our Constitutional rights.

20

123.   The County failed to adequately train its law enforcement officers, including, but not limited to, Deputy Abbey and Sheriff Arnold.

124.   The County breached its duty to investigate and solve crimes.

125.   The County breached its duty to adequately train and supervise.

126.   The County proceeded with an unreasonable and deliberate indifference regarding its investigation and solving of crimes, which violated Raugust's Constitutional rights.

127.   The County's violations of Raugust's Constitutional rights shock the conscience.

128.   The County's customs and practice unreasonably resulted from its deliberate indifference. The County's deliberate indifference reasonably resulted in Abbey not disclosing his observation and conviction of an innocent man.

129.   The County's customs were the moving force behind the violation of Raugust's constitutional rights.

130.   As a result of the County's breach, Raugust's Constitutional rights were violated.

131.   The County's breach resulted in Raugust's wrongful arrest and conviction.

132.   Pursuant to 42 U.S.C. § 1983, the County is liable to Raugust because it deprived Raugust of his Constitutional rights.

133.   As a result of the County's violations of Raugust's Constitutional rights, Raugust has been and continues to be injured and damaged in an amount to be determined at trial.

## Punitive Damages-Deputy Abbey

134.   Plaintiff realleges each previous paragraph as though fully set forth herein.

135.   That, upon information and belief, Deputy Abbey committed the acts alleged herein with knowledge of facts or with intentional disregard of facts that created a high probability of injury to Raugust, and (a) deliberately or recklessly proceeded to act in conscious or intentional disregard of the high probability of injury to Raugust; and/or (b) deliberately or recklessly proceeded to act with indifference to the high probability of injury to Raugust.

136.   Deputy Abbey's actions were "motivated by evil motive or intent, or … involve[d] reckless or callous indifference to the federally protected rights of [Raugust]." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

137.   By performing the acts alleged, Deputy Abbey acted with deliberate disregard for Raugust's Constitutional rights, permitting an award for punitive damages.

138.   By performing the acts alleged, Deputy Abbey acted with malice towards Raugust, permitting an award for punitive damages.

\\\   \\\   \\\

22

**Jury Trial Demand**

Plaintiff Richard Raugust demands trial by jury on all issues so triable.

**Prayer for Relief**

Plaintiff Richard Raugust prays for judgment as follows:

1.      Compensatory damages from the County and Deputy Abbey, jointly and

severally;

2.      Punitive damages against Deputy Abbey;

3.      Costs and disbursements incurred herein;

4.      Interest;

5.      Attorneys' fees; and

6.      Any additional relief the Court deems just and appropriate.

Dated this 18th day of April, 2022.

 /s/ Hillary P. Carls
Hillary P. Carls
Sherine D. Blackford
Melinda Driscoll
*Attorneys for Plaintiff*